Good morning, Your Honor. Are we ready to go? You're back. Yes. I think you didn't bring the briefs this time either, huh? I actually have some. I'm sorry? I actually have my briefs in the, but I apologize, Your Honor. My wife had surgery on Tuesday, and it's a long story, which I won't bore the court with, but I apologize for not having it. You couldn't boot up your computer? You couldn't bring a bunch of briefs into court because your wife had surgery? That's pretty cheap. It's a long story. That's pretty poor. It's a long story. Believe me, Your Honor, that you don't want to know about right now. But I apologize to the extent that it caused any problems, but I do have the electronic version for it. Your Honor, a couple of issues here. I think they're very, very significant. First, of course, is the Stern issue. Wellness International, of course, clarified that implied consent is okay, except for the fact that the requirements for showing implied consent, you have to know that you have the right to object, and you have to voluntarily waive that right. Didn't we have an opinion in this court well before you raised the Stern question, our version of Stern? Well, you have the decision in Stern, which then was up on petition for certiorari. Right. Is that good enough, and why isn't that good enough? I thought under Bellingham that's good enough. Well, you know, the issue in all of the cases, there's a theme that goes through, of course, Stern and Bellingham, each time the Supreme Court kind of clarified even further. In this case, even under Stern, even under this court's ruling, which was up on appeal, which the Supreme Court granted cert on, it still was an issue where Mr. Blitzeff had a right to object to the fraudulent transfer claims as being a non-court claim. In other words, it was still a court claim, and that was an issue that was not actually decided at this point, because it was up on appeal. Well, that's the question. The fact that we have an opinion is not some kind of notice that you should maybe preserve your rights? Well, it is, Your Honor. It's obviously there's some notice, but the Supreme Court granting cert was dealing with those exact issues of whether you had a right, whether the court claim could legitimately be designated as a court claim. And in this case, don't forget that there was a convoluted process to get to a final judgment, and all along the way, Mr. Blitzeff objected to the entry of any judgments by the bankruptcy court on non-court claims. But did Bellingham deal with this exact problem? I was just going to say, didn't executive benefits say that the Ninth Circuit opinion in Stern put the debtor in executive benefits on notice, and that he should have raised his objection earlier? And that's essentially what happened here. There was that language, Your Honor, except for the fact that in that case, you had a de novo review by the district court anyway, so it became a moot point. What's that case? Not Bellingham. It's the other case. We're talking about executive benefits.  Well, same thing, Your Honor. I mean, in Bellingham, initially, the court did say, hey, this was an issue which was flagged, but it certainly wasn't decided at that point, and I don't think that just because it's an issue that's up there… And it should have been sufficient to alert EBIA, which I guess is the same group, to the possible jurisdictional problem. But we raised that jurisdiction issue, although in all honesty, Your Honor, we didn't raise it in reliance on the Stern case by the Supreme Court. Once the Supreme Court issued its decision in Stern, we obviously were raising it all the way through, and there had been no final judgment entered by the bankruptcy court as of that date. So we're not claiming, for example, that the court couldn't make findings of fact and conclusions of law. What we argued is that because there was no final judgment entered, we preserved that right to have findings of fact and conclusions of law ruled on by the district court, not the bankruptcy court. And by objecting to the bankruptcy court's ability to enter final judgments on non-core claims, that should be sufficient when this court determines that a fraudulent transfer cause of action is in fact, shall we say, a species of non-core claim post-Stern. So, other than the fact that Mr. Blixeth didn't object prior to trial on the issue of Stern, on the issue of the core versus non-core issue, he's preserved his rights at every step of the way other than that. And unlike the other cases... If we agreed with you, what would we do? Well, if you agree with me on the issue that Judge Pershing... Back it back to the district court and treat the opinion of the bankruptcy court as findings and conclusions and do a de novo. It would be a de novo review. Now, for other reasons, Your Honor... Would we do a de novo review ourselves and just cut the problem out? Yes, I think you could. And I was about to say, that begs the question, and I would urge the court not to simply remand, of course, because these issues, as the court clearly knows, underlie almost all of the cases involving Mr. Blixeth. And when I talk about these issues, I'm talking about not only the ability of the bankruptcy court to enter final judgments, such as summary judgments, maybe preliminary injunctions, or final judgments themselves, but I'm also talking about the issues raised and presented by the divorce proceedings and the effect of those divorce proceedings on the claims that have been brought against Mr. Blixeth. And the reason I would urge the court to address those issues rather than simply remand is because over the period of time we've gone through... We're on our sixth year of litigation involving the marital settlement agreement and the divorce proceedings. And in a very real sense... I must say that I do not understand your arguments in that regard. As your... I'm American. The debtor was not a party to those proceedings. There were... Just a minute. They were dividing their assets in the debtor, but they were not 100% owners of the debtors, as I understand it. There were other people's interests involved. Those interests were not represented because the debtors weren't there. I don't understand how that bankruptcy, the marriage dissolution, could be preclusive of anything. And moreover, I don't know that that judgment could be preclusive on the question of whether there was a fraudulent transfer or breach of fiduciary duty anyway. Well, I think... Honestly, Your Honor, I think it's directly on that issue. Now, you're absolutely correct. There were minority shareholders in Yellowfin Mountain Club, LLC. 82% was the community property. But the real issue here is the debtor bound by the findings of the family court. And I think that's where the... One of the many reasons where... Issues where Judge Kershaw went astray. The reason is the rationale for not holding them bound by the releases, for example, is that they were not represented by independent counsel. Never a requirement in California. That they were not parties to the litigation. That is actually contrary to California law. Chernobyl v. Superior Court. You don't have to join, and it's the rare occurrence to join, a community property entity to a divorce because the family court has full jurisdiction over all community property of the parties. Well, community property was stocking the debtors. It wasn't the debtor. Well, sure. I mean, it was Blixeff Group International, Inc., excuse me. It was the debtors and 60 or so other companies and properties that were community property of the Blixeffs that was divided in the divorce. And to say that the releases don't bind the community property assets when Mrs. Blixeff, involved here by the court, stood up and confirmed, and the court found in the family court, that she had full authority, and Mr. Blixeff confirmed that he had full authority, to bind each of the entities that they were receiving in the divorce to the releases and the marital settlement agreement. They're parties to that. They're bound by that. We're not talking about a... I don't understand. There is no question that these releases existed. But what is the fact that the marriage court approved it have to do with the issues in this case, whether they were fraudulent transfers, whether they were the result of breaches of fiduciary duty or anything else? Well, because the fraud, if you take a look at... Let me take a step back and talk about the subsidiary claims. When I say subsidiary claims, I'm talking about breaches of fiduciary duty, conversion, wrongful distribution, those claims. Those are straight up released in the releases. So that's how, between the community property entities who sign on the releases, those are gone. Those should be gone. And approved by the family court. Had they not been... Had Mrs. Blixeth or Mr. Blixeth said, I don't have authority to do this, we need an independent counsel, which would be contrary to California law, but nonetheless said that, there wouldn't have been a marital settlement agreement. Now, talking about the fraudulent transfers, what was the claim of fraudulent transfer? They were pre-divorce transfers... And they're released. And they're released. Between Mr. Blixeth and Mrs. Blixeth. And to say that that's not... And I go back to the Bledsoe case from this court, to say that that's not a litigated, non-pollusive, final judgment, that establishes reasonably equivalent value for those transfers of community property between the Blixeths. And those transfers are the foundation of all of these lawsuits. That's how it ties in. Because if the court finds reasonably equivalent value, which it must when you take a look at what the parties have received, then there is no claim against Mr. Blixeth. There's no valid claim against Mr. Blixeth. So, that is the tie-in from the divorce proceedings. And it wasn't even a secret, because the minority shareholders sued in May of 2006 for their own share of that alleged fraudulent transfer from the Credit Suisse loan, the $209 million. They sued derivatively for that in 2006. And that ties in, in similar respects, to the note case, the district court's case. Because if all of the transfers that are subject to the note case, as I call it in the district court, those are also right out of the divorce. The transferor in that case is Mrs. Blixeth. Mr. Blixeth transferred ownership of BGI, Blixeth Group, Inc., pursuant to the marital settlement agreement to Mrs. Blixeth. And in return, Mrs. Blixeth canceled his notes to BGI and assumed the liability and signed off on separate leases for that. So, if that was done for reasonably equivalent value, how do you... The bankruptcy court said Mrs. Blixeth was insolvent at the time she did that. The court did find that. But what this means, Your Honor, is you can never... I think we can operate from a common point here, which is that if you have a divorce and it goes to trial and the judge divides those assets at trial, I think we can all agree that that would be an absolute defense to a fraudulent transfer cause of action under Bledsoe and under BFP. So, if you start from that perspective, how is it with no evidence of collusion or fraud or any kind of misrepresentations, how can you conclude that a marital settlement agreement, hotly litigated, settling lots of different lawsuits, lots of money at stake, with no allegations that there's any kind of collusion or fraud, how can that not be the same kind of protection that you'd have if you went to trial? And I'll take... What findings did the Superior Court make in connection with its approval of the settlement agreement? Well, and I don't mean to be flippant, Judge Baez, I'm sorry. What findings didn't the family court make? How much of what findings did the Superior Court make? Well, that's what I'm saying. I'm just turning it around because, literally, the family court made every finding that you could think of to protect the parties. He thought that there was any value in the assumption by Ms. Blixeth of the BJA notes given that she was later found to be involved. Did he make any findings about that? Well, he found... The family court made findings that each party knowingly and voluntarily took these assets, understanding that they had the opportunity and did take discovery to determine the values. It could all be equal between them, but what does that have to do with whether or not it was an equal value for the debtors' value with regard to the releases? Well, because the debtors were bound by those releases as well. The debtors were part of the family court case, and so when Mrs. Blixeth got... When they were part, what do you mean by they were part? They were parties? Yes. Well, they were not formally parties, as you well know. You know, I asked the question, you immediately said yes. Yeah. Your Honor, when I say they're part of the family court case, I'm referring specifically to... I'm not asking what you meant by... I asked you a question, were they parties? And you immediately said yes. Is that right? It's a qualified answer. Excuse me? It's a qualified answer, because as community property... So if I look on the caption, I will find them as parties? No. If you look in the caption, it will be marriage of Blixeth. But they are community property assets. Is this a complicated question when I ask whether they're parties? Is that a complicated question? Is that a nuanced question? Is it, you know, like what shade of yellow or something? I understand. Well, Your Honor... So let me start this again. Were they parties? They were not formal parties to the proceeding. Were they informal parties? Yes. What is an informal party? Well, that's why I say, because they were community property assets... But they weren't community property assets. The debtors, as I understand it, the stock in the debtors was community property assets. But there was other stock in the debtors, which didn't belong to either of them. 82% of them. So what? Yes, you're right. So what? That's correct. So they were not, the debtors as such were not community property assets. Is that correct? Correct, yes, Your Honor. Okay. So there couldn't have been parties there? Well, you see, this is the problem. The question is not whether they were parties to the litigation as much as whether they're bound by the results of litigation. And that's why I made that nuanced answer, Judge Kaczynski. If, for example, there was a breach of fiduciary duty to the people who were not, to the B shareholders, what would that have to do with the bankruptcy, with the marriage? It would... Nothing. So nothing in that order could have had anything to do with that, right? Nothing in that order would have prevented the B share, would have wiped out a claim that the B shareholders would have had. Correct, Your Honor. Or the entity in which they held shares because the entity as such is separate from the shares. Well, the entity... Yes, right. Yes, you're right. The entity is managed by Blitzeth Group International. Blitzeth Group Inc., excuse me, Blitzeth Group Inc. held the stock for the debtors, the 82% that interest. Blitzeth Group Inc. was 100% owned community property. And that money, that entity was the holding entity for all of the assets that the Blitzeth had, many of the assets, I don't want to say all, had accumulated, such as the Porcupine Creek, the house that was valued right before the marital settlement agreement at $207 million, free and clear. The Casa Captiva, which was valued at $20 million in Mexico. Various other assets and corporations, all were owned by BGI. BGI was not a named party in the divorce, of course, because it was fully community property. And it controlled the assets, sorry, controlled the stock in the debtors. And part of the claims in this case, in both the bankruptcy court and in the district court, and the district court focuses directly on the Blitzeth Group Inc. transfers, those are all part and parcel of the divorce. So while yes, I agree with you 100% that the shareholders or other creditors would not be bound by the releases between the parties, when you have the entities who were bringing the lawsuit as the signatories on the releases, and you have the manager of those entities, which is Blitzeths, BGI, representing the court that they have full authority to execute all of the documents. I'm sorry, which court? We're in the family court. It turns out that they were executing a fraudulent transfer, i.e. that they misrepresented to the marriage court what they were doing. The entity and the debtors in the bankruptcy court can't do anything about it. Well, you're hypothetically asking if they misrepresented something into the family court, correct, Your Honor? Yes. Well, if one of the parties made a misrepresentation and the other party wanted to act on it, there is a statute for moving to set aside a marital settlement agreement, but that's hypothetical. You're talking in parties again, and we've already established that the only parties to the divorce were the Blitzeths. So why are you telling us that a party can set aside a decree if they misrepresentation to the other party? These are not parties. Can the creditors of one of the parties to a marital dissolution case set aside the decree because another creditor or somebody else who's not a party made a misrepresentation to the court? No, Your Honor. Okay, so why are you talking to us about parties being able to set aside – well, what does that have to do with anything here except to confuse issues? Sorry, Your Honor. The $209 million proceeds of loan, okay, which was at issue in the bankruptcy court, that went into both the Blitzeths. Both Blitzeths, Idra and Tim, had use of that money for years. Give me the bottom line. I have no idea why you're talking about this. I asked you a specific question about a specific legal issue, and you go into a mindset about – give me the bottom line and then explain. Let me get rid of this, Your Honor. Because of the fact that these are community property assets, and specifically Blitzeth Group Inc. controls all of that, because of the findings of the family court that both parties had authority, because of the findings of the family court that the parties agreed it was a roughly equal split, and it still falls. Can you just give a straight answer to my question? Then explain. You're explaining again. If you want the ultimate bottom line, this should be the decision of the bankruptcy court. No, what I want is an answer to my question. You've probably forgotten the question, because you've taken so many detours. No, Your Honor. Just give me the answer to the question, and then you can explain. I will let you explain to your heart's content, but within limits. I think that the fact that – the bottom line here is that all of the community property is bound by the family court. I didn't want a bottom line. I wanted an answer to my question. You probably don't remember the question. Why don't you restate the question so we both know what the question is? Your Honor, if you restate it, I'd be happy to answer. No, I'd like to – you said you know what the question is. Why don't you go ahead and just prove to me that you know what the answer is? Your Honor, I thought the question was, why are these – why am I saying that these parties are bound when they're not parties? That's what I thought the question was. I think that's pretty close. The question is, why do misrepresentations by non-parties, if there are any, provide grounds for setting aside a divorce? Misrepresentations by non-parties don't provide a reason to set aside a divorce. Okay, so when you said they could have, they had remedies, the creditors had this remedy, they could go and set aside the decree, that was wrong. Well, that's what you heard from me. I definitely misspoke. I didn't mean it that way. I suggest you go back and look at the tape of this whole argument because I'm pretty sure that's what you said. What I meant was, and maybe it wasn't clear, was that just because there's a decree in the divorce doesn't mean a third-party creditor that's not community property can't sue for whatever remedies they have. That's what I'm saying. Can I just change the subject? Because you've been talking only about one thing in a case that has many issues. Yes. So I want to know a couple things. One is, assume for a moment that you're wrong about this whole thing about the marriage, okay? That we're not going to reverse about the marriage. Make that assumption for now so we don't come back to that question. So then we have a bunch of other questions. One is, there was a big argument whether this was a distribution or a loan. Does it matter? Does it matter whether it was a distribution or a loan? Yes, it does. For purposes of fraudulent transfer or breach of fiduciary duty. Why? Yes, it does. Because if it's a loan, it's not a fraudulent transfer. Why? If it's a distribution. Why isn't it a fraudulent transfer? Well, because there's a promissory note that's being repaid. No, but if it's just a bad, facially terrible loan, what difference does it make whether it's a loan or a distribution? Why should we worry about that? Because you have to look at it from the time, at the time, the fact of the time. But I'm asking conceptually. Listen, we're having the same problem again. All right? My question is, I understand that if it's a good loan, it's not a problem. But if it's a bad, terrible loan, does it matter if it's called a loan or a distribution? I think so. Yes, Your Honor. Why? Because if it's a bad loan, then it could be a bad loan. A loan that he, it was a loan, but he never meant to repay it. I mean, does it matter what we call it? Well, it... Or there's no way he had the means to repay it, or whatever. If it was, if he, if Mr. Blixeth wrote a promissory note without any intention to pay, let's say I had, if I executed a promissory note for $200 million, okay, I think it's pretty safe to say it's a piece of paper that's not worth the paper it's written on. But when you're looking at these parties, there were all of these assets, there was a lot of money at issue. Nobody could say, and in fact, Mr. Blixeth actually repaid on that loan. Nobody could say that from the beginning when those promissory notes were written, when those loans were made, there was no way to repay those loans. And I'll give you a perfect, and that's why I think that comes into play in distinguishing between a loan and a distribution. Because if it's a distribution, then you could start, then you can claim, potentially, fraudulent transfer, although obviously I submit it's not applicable. But if it's a loan, and there's a reasonable ability to pay that loan, an ability to pay that loan, it's not facially invalid, then I would think, then that would make a big difference in terms of... So here's another question. I mean, it seems to me that the major issue here, which we haven't addressed at all, is the power of delicto, ruling which saves your client a lot of money, even though it was determined that he, in fact, had engaged in a fraudulent transfer for all of the money. And putting this, you don't seem to want to argue about the merits of that, and if you want to, you can. But what I want to know is, we also have the notes case. It's consolidated here. They're going after the same money, right? If we decide one one way, is the other one moot? In other words, if the notes case recovers the money, is the power of delicto issue moot? And if the power of delicto issue, if we were to reverse the power of delicto question, would the notes case issue be moot? I don't... If you reverse on the power of delicto, I think the notes case might be moot. But here's the problem with both, and this is why I'm not sure the answer to that question. The notes are the same basic, it's the same basic loan that was at issue in the bankruptcy court as then is at issue in the district court. The promissory notes between BGI and the debtors is the same amount as it was just passed through BGI and represented by notes in that amount to Blixeth. Now, what's happening here is, in the bankruptcy court, they're looking for a 200 plus million dollar judgment on the notes between BGI and the debtors, and holding Blixeth responsible based on an alter ego theory, so piercing the corporate veil of BGI, and then they're stepping over to another court and suing Mr. Blixeth on the same notes that they claimed BGI was an alter ego for. So he ends up being liable potentially for 400 million plus in judgments, not just two. I'm assuming that's not going to happen. I mean, that's what I'm trying to find out. Is there any chance he's liable for 400 million, or is it one or the other? Well, I think it's one or the other. Why wouldn't payment on one just be offset on the other? Well, it should be. Well, that's what would happen. But, I mean, I think I agree with you. What I'm really asking is, is there any technical difference between the judgments that would make them non-redundant in the way they would be enforced, or something about them that would mean that although you can't get the money twice, the two judgments could still be valid judgments? I know that the liquidating trust takes that position. I don't know that they take that position. I haven't asked them. That's what I'm trying to find out. On one case, in the district court, they're acting on behalf of BGI, Blixith Group Bankruptcy. And then, in the other bankruptcy court case, they're operating as representatives of the debtor. And so, in the district court, they have a profit-sharing plan for BGI, but in the bankruptcy court, they keep it all to themselves. All right. So, it should be, I agree with you, Your Honor, there should be an offset on that. But, because of the different parties and the way they're acting, the way they're representing themselves, I think that that causes the problem. And the legal defenses in the note case, the district court case, are slightly different than the legal defenses in the bankruptcy court. Although, of course, they overlap. And the reason that they're slightly different is because, in the note case, in the district court, with BGI, there is no question that BGI was 100% community property. And there's no question that it had a tremendous number of assets. There's separate documents that were executed specifically by Idra Blixith to obtain ownership of BGI. And so, there's a number of defenses that come into play there that are different, albeit overlapping, with the defenses in the bankruptcy court. So, it really creates, and which really is an issue that kind of segues into my colleague, Mr. Conant's, discussion in connection with the Barton Doctrine and the standing issue. Because under Kaplan, what hat is the liquidated trust wearing in the district court? Are they a bankruptcy trustee, or are they a third-party creditor, an independent creditor acting as a creditor? Well, in connection with the Blixith group, BGI, bankruptcy, they're claiming to be just a creditor, and therefore they can take an assignment of those claims. But, in trying to dodge liability on the counterclaim in the district court, they're claiming that they have the protection of a bankruptcy trustee. And if they had the protection of a bankruptcy trustee, then they wouldn't be able to take an assignment as a third-party creditor and bring claims that would otherwise have to be brought by the bankruptcy trustee. Okay, you're on time. Yes, Your Honor. Thank you very much. Appreciate it. May it please the Court, Steve Hoard, for the trust on these consolidated appeals of AP 14 and in the Central District of California case in front of Judge Fease. I can address some of the stern issues, if I could. This case was tried, AP 14, was tried in Missoula, Montana at the end of February 2010. It had been pending for some period over a year at that time. This circuit's opinion in stern came out in March of 2010, less than a month after the trial was over. And five months before Judge Kercher, the bankruptcy judge, issued his ruling in the case. After the trial was over, of course he took it under advisement, and the trial was over at the end of February. We didn't get a ruling until August, I think August 25, 2010, when he issued his 135-page memorandum of decision. Mr. Blix has never objected prior to getting the adverse ruling. And in fact, he didn't object for 14 months after getting the adverse ruling, after the Supreme Court's decision in stern came down. I don't think it is a colorable argument to say that Mr. Blix wasn't aware of his right to object until the Supreme Court's decision came down, because when the Ninth Circuit's decision came down, that was the law of the Ninth Circuit, notwithstanding the writ of certiorari. It may not have been the law in the Fifth Circuit or the Seventh Circuit, but it was the law in the Ninth Circuit at that time. But I want to go one step even farther. I don't know how immersed this court is in the history of the bankruptcy code. You're probably going to be a little more immersed in it. You're talking about stern now? I am talking about stern, and I'm talking about the question of knowing. You didn't get a lot of questions on it. Why don't you move on to other issues? I'm not quite sure which issues the two of you are going to be discussing. I want to talk about the solution, the divorce decree. I don't know if that's your issue or Mr. Stoneman's issue. I'm handling the whole thing. You're not getting any traction on stern. You're not getting any resistance. Why don't you move on to something else? I'm not. He's doing the whole argument. Before I go on, I should have done this at the beginning. If I could reserve— Are you doing the whole argument? I am. Okay, that's fine. I'm doing the cross-appeal argument as well. If I could reserve—I don't know if Mr. Stoneman had any time left. Okay, he doesn't have any time left. I was going to ask for one minute of rebuttal on the cross-appeal aspect of my argument. But maybe I don't need that. The divorce is simple. Judge Berzon was absolutely correct. The asset that is part of the community estate of the Blitzes during the course of their divorce, which went from 2006 to 2008, was their ownership interest in the entities, not the entities themselves. The entities themselves are separate entities. That's what the whole law of corporations is about. And the law respects them as separate entities unless there are grounds to disrespect the separateness, such as in an alter ego's— Well, then what about—I understand that with regard to the debtors in the first case. But in the second case, the notes case, the debtor is BGI BLX, which was determined to be an alter ego and which was 100% owned. So what about—but nonetheless, the net result was to find that those releases, which were actually different releases and included an assumption of the lease by EDRA, were also fraudulent. Well, actually, I couldn't quite tell whether Judge Feist was making a collateral estoppel point or a collateral estoppel partial, collateral estoppel, or whether he was finding it directly. But ultimately, they were found to be a fraudulent transfer. So is that different with regard to the impact of the marital settlement? It should be no different. It should not matter whether the corporation, the separate entity, is owned 100% or 50% or 10%. And what about the fact that it was declared to be an alter ego? The fact that it's declared to be an alter ego should not go— in order to the benefit of the person who has improperly managed their corporation, thus giving rise to the argument for an alter ego, the person, the individual owner of a corporation who uses this corporation to defraud a creditor— But you did begin by saying, unless it's an alter ego, and then it turns out it is an alter ego. It's an alter ego, but the alter ego doctrine is an equitable doctrine that benefits the injured party. It's not something that the owner of a corporation can use as a sword to counterattack a creditor in this situation. So that—and I would say that you mentioned that there were other releases. There were other documents, but they're totally redundant of one another. Well, they're not totally redundant because one of the documents has Edger purporting to— the payment of the notes to BGI, as I understand it. She wasn't just waiving claims. She was purporting to assume the obligation. Correct, Your Honor. And as the record will reflect, the notes themselves from Mr. Blix— Notes themselves from Mr. Blixith to BGI, later called BLX, were canceled by a handwritten notation on the face of the note, canceled, superseded by a replacement note, and Edger Blixith executed. So how are they totally redundant? They weren't totally redundant. Because? Because when Judge Kershaw was looking at it, he wasn't concerned with that purported assumption because he wasn't concerned with BLX directly as such. And he never really—I mean, he mentioned it, but he didn't really deal with it. And then when he gets to the notes case, Judge Feist says, well, I'm going to treat them all as one. But were they really all one? They really were in this sense, at least. All three documents, that is, the releases executed pursuant to the MSA, marital settlement agreement, the assumption agreement, and the cancellation, the physical cancellation of the notes, all accomplished the same purpose of releasing, purportedly, releasing Mr. Blixith from liability on the notes. They all accomplished that same objective. Then other things happened. And the other thing that happened was Edger Blixith, in return for that, that's a transfer, the release is a transfer. In return for that transfer, what the debtor, what BGI received, was a replacement note from Edger. And that's documented in these agreements. But that's—if you just focus on the transfer from BGI to Mr. Blixith, which is the release, focusing on that initially, those three transactions contemporaneously undertaken all accomplished the same objective, which was to release, on the face of it, release Mr. Blixith from liability on those two notes. If Edger was not, in fact, insolvent, then one might think that the assumption was an equal value and would stand in the way of determination of a fraudulent transfer. I'm not sure I follow that question. Edger was insolvent. Right, but if she weren't— If she were not? If she had not been insolvent— In other words, it's different than just the release. When they just released the claims, then you look at it and say, well, there's no value going the other way. But here the purported to be value going the other way. You have to have a finding that there wasn't, in fact. And we have a finding that there was no value received back from Edger because Edger was insolvent. So that means we second-guess the Superior Court's decree. Not at all. I will say I have an excerpt from the record that I'd like to read to you. This is the supplemental excerpt of a record at page 241. I mean, 2410, sorry. And this is what the divorce court said. This is after the fact. This is after the settlement has been taken care of and the judgment confirming the marital settlement agreement has been entered. We're down the road now, and the litigation has commenced in Montana, and Mr. Blithfuss goes to the divorce court or marriage court, calling California D, and tries to get the marriage court to take over this dispute and make findings and so forth. And this is what the marriage court said at the hearing. One thing that never did fade from my memory was that at least in the two-hour hearing we had putting the waivers and releases on the record because it was and remains the most unusual settlement agreement that I never put on a record because I never heard the terms of the settlement. It was all, all, all about making sure that petitioner and respondent, both of whom acted without advice of counsel, without counsel's input into the case, and in some respects did it contrary to counsel's advice, were doing this knowingly and freely and eyes wide open approach. So it was the most unusual non-settlement agreement I ever put on a record. The marriage court never saw the terms of the marital settlement agreement, never made any determination of the value of what was being exchanged, but simply accepted the agreement that had been entered into by Tim Blixeth and Idr Blixeth and confirmed that they had done it knowingly. A consent decree is nevertheless a decree. It is. You know, we have lots of consent decrees in federal court, prisons, all sorts of things, police departments, schools, and I can't swear that district judges who approve those decrees have read every word or necessarily always understand every word, not to impugn them, but they are experts. I mean, these things get very complex. And nevertheless, our law is that once a court approves it, it's not only a contract, but it's a court order. And so how can we, I mean, let's assume that everything that Superior Court Judiciary says is true. What does it matter? I mean, once a court enters it as an order, why is it not an order which we are bound by full faith and credit and we can't just set aside. We can't just ignore it. Where do we get the authority to undo a, we sort of become, it's like the Rucker-Feldman doctrine. We become an appellate court to a state court proceeding, which it's sort of a quasi-Rucker-Feldman problem, isn't it? I don't believe so, Your Honor. I have a one-word answer for you. The what? Mejia. The Mejia case, California Supreme Court, clearly, unequivocally holds that a marital settlement agreement confirmed by a divorce or marriage court judgment that transfers made pursuant to the marital settlement agreement confirmed by a marriage court judgment are subject to attack as a fraudulent transfer. California Supreme Court. Well, no, that's fine. You can do it, but you have to sort of show, you have to sort of undermine the judgment in some way. What do they say you can use to attack it? Pardon? What kind of evidence can you use to attack it? And can you do it outside the system? It's one thing to go back to the state court and say, look, this was a fraudulent transfer. Can we do it in the federal system? Most certainly. Here is the, I think the premise of your question is faulty, because in the fraudulent transfer action, the one that we brought, the one that the plaintiffs in Mejia brought, does not attack, it's not a collateral attack on the judgment or the marital settlement agreement itself. Well, certain aspects of it, for sure. It does, and the California Supreme Court, if I'm getting this confused with the related case of Beverly, I apologize, but either in Mejia or in Beverly, the court found that although it's specifically holding in both cases that you could attack transfers made pursuant to marital settlement agreements as fraudulent transfers, that that could have the impact of upsetting the apple cart and cause the parties to go back into court. But that was not their concern, and they specifically said, you know, those apples are going to fall where they fall, but you can do it, because remember in Mejia, what you have in Mejia is you had a woman who had a child with the spouse out of what they weren't married, and he was married to another woman, he had the baby with a different woman, and she's bringing a claim to set aside transfer made pursuant to the marital settlement agreement because she feels like the guy had basically gotten rid of all of his non-exempt assets to the wife in the divorce, and so she wasn't going to be able to collect child support from him. And so that's the basis of her claim. Are you going to talk about the parent-electo issue? And first, could you answer my question about how the two cases fit together? Well, I have two questions preliminary to the parent-electo. One is, does it matter if it's a distribution or a loan for fraudulent transfer purposes? It does not. I mean, a loan can be... So why was there so much litigation over that? It was just another defense that Mr. Blix has raised that was rejected by the court. No, his defense was it was a loan, and you argued vigorously that it was a distribution, and why didn't you say it doesn't matter? We argued it was a distribution in the context that it was a badge of fraud in connection with a fraudulent transfer because the money, the FedSwiss loan proceeds came out to him. It came out to him initially without any documents, without any notes being signed and so forth, and then only when the B shareholders, the minority owners of the debtor, began to question him and raise questions about what had happened, only then did he come back in behind and document those transfers as notes. That's the actual history of it, and certainly our case was basically... It would not have mattered whether it was a loan or distribution as far as we were concerned because it was a fraudulent transfer because... It was a loan or it was a loan that wasn't going to be repaid, so... Right, and so that's not a big issue with us. The two cases, the issue with the two cases, we're only seeking one recovery, and I think Judge Baez was correct that it would be just an offset of one against the other. I mean, there's only going to be one recovery. Mr. Stillman was correct that the waterfall under the confirmed plan in the BGI BLX bankruptcy is different than the waterfall under the confirmed plan in the Yellowstone debtors, and so there's going to have to be some reconciliation of those two, between those two estates, but that shouldn't concern this court. Well, it concerns us in the sense of do we need to deal with both judgments or do we just need to... If we affirm on the notes case, do we need to worry about the paragilepto? If we reverse the paragilepto, do we have to worry about the notes case? In other words, is there some reason why you're entitled to two judgments even though you only have one recovery? Well, candidly, given the circumstances as we know them today... You're not going to get any money anyway. That's because I was going to say this is all very academic, I'm afraid, but nevertheless, I'm not in a position to, and I'm not authorized by my client, to say we'd be happy to take one or the other. And you think they're not technically redundant, essentially? They are not, and the only thing would be protection for Mr. Blixa. Well, he can't recover twice, I understand that, but the judgments you say are not technically redundant. They are not. I mean, we're asking for both judgments. Do you want to argue about the paragilepto issue or you don't? Pardon? Do you want to say anything about the paragilepto issue or do you not? No, I can talk about the paragilepto. I am obviously 100% convinced that Judge Kurser was wrong, and the briefing supplied to the court by Mr. Stillman does certainly not support a counterargument to that. On a purely sort of common-sense equity basis, it seems like he – well, on the one hand, why should Blixa get off the hook? On the other hand, why should Credit Suisse be getting the money? So if he wants to accomplish that, how would he do it? Well, the way it should have been done is the claim of Credit Suisse should have been disallowed in the bankruptcy instead of just equitably subordinated. The trial of the case, the first phase of AP 14 – It was settled is what happened, right? Pardon? That issue was settled. It was settled, and Judge Kurser approved the settlement, and the settlement was incorporated into the terms of the Chapter 11 plan, and Judge Kurser approved the plan. And the plan said equitably subordinated, not disallowed. So now if the claim had been disallowed, we wouldn't even be having this discussion because we could have theoretically collected the whole $286 million from Mr. Blixa. There were only $40 million of unpaid creditors in the case, or $41 million roughly, as found by Judge Kurser, and that's what he reduced our judgment to. The surplus, the $245 million, would have gone back to the equity holders under the standard provisions of the bankruptcy code. It would have gone back to ELX, which itself is in bankruptcy and could use the money and has its own creditors. But that, unfortunately, you're stepping back, and we could all look back, step back and say maybe that's what should have happened, but unfortunately that didn't happen. And now we have a confirmed plan that says if more than $41 million is recovered, because that's the amount of the claims that come first ahead of the subordinated claim. But you're saying you're briefed that they could still, down the line, do a paragraph against with regard to a credit suite before they could actually collect any money. Yes, and in fact, one additional thing to point out is that, and it's pointed out in one of the cases we cited, I'm sure it's the Nesselson case, this argument was rejected, no, it's the Borden case, this argument was rejected by the court in that case. The trustee of an individual debtor was trying to, by virtue of an assignment from various mortgage companies who had been defrauded by the debtor and co-conspirators, was suing the co-conspirators, and the co-conspirators made this exact complaint that impaired delecto because the debtor, of course the trustee wasn't bound by what the debtor had done, but their argument was that you're suing us for more money than it takes to pay off all the other creditors, and this guy as the individual debtor could conceivably get a benefit. And that was the basis of the objection, and the court rejected that argument and said, you know, that's a possibility, but that's no defense for you. You have other remedies, and your other remedies would have been for, and now let's change it from Borden to Mr. Blix's, Mr. Blix's other remedies against Credit Suisse would have been to make a claim directly against Credit Suisse. And in fact, he did make a claim against Credit Suisse,  And so that would have been, and that's exactly what the Borden case says. So, just as a matter of law, Judge Kircher, on this one narrow little point, was wrong. And I understand, you know, from a fairness perspective, I understand what his thinking was. We, you know, just inherit the case as we get it. We don't have any connection to Credit Suisse. We don't deal with Credit Suisse at all. We don't care about Credit Suisse. But our job is to maximize the benefit for the estate, and then the assets flow where they flow. So I think we've addressed that. There's one more thing I want to make sure I address. Let me ask you this. If we agree with you on the parent-elect issue, what's the result? What's the relief you're asking for? To find that it was an error as a matter of law to apply the impaired debt and collective defense to the trust, under the circumstances of this case. Because, exactly why? Because, why was it an error of law? Because it doesn't apply. It doesn't apply to these types of claims. It doesn't apply to the trust or the debtors. The bad conduct found by Judge Kircher is the conduct of Credit Suisse. But he's made specific findings that Credit Suisse's bad conduct did not be imputed to the trust or to the debtors, that neither the debtors nor the trust had done anything wrong. And so he's taking the bad actions of a third party and using that to reduce the judgment amount. What's the answer to Judge Pius's question? What happens next? For the proceedings in district court, or just the entry of a new judgment, or what happens? Well, this court could reverse that and render, because the judge unequivocally found that our actual damages were $286.4 million. And the only basis for reducing them to $41 million was the application, the erroneous application of the impaired delecto doctrine. And so there's nothing further to be done. I mean, I think the record is complete. I'm tempted to say, please don't remand. You know, as you can probably anticipate, I actually tried this case in February of 2009. And I was the primary lawyer working on the motion for summary judgment in the case in Judge Pius's court. And I think as Judge Kircher said in his opinion, rejecting Mr. Blix's motion to dismiss based on the stern doctrine in 2011, he said Blix was arguing that the case called out for correction, and Judge Kircher said the case calls out for finality. And so I would respectfully ask this court to try to issue an opinion that is conducive to finality. There was just one minor issue. I think Blix's challenge is some amount of the damages that were included in the $40 million, the B shareholders' claim, American Bank. And those are the only two that sort of piqued my interest. Well, there was an evidentiary hearing after a little procedural background. The court issued a judgment, the initial judgment, which the court drafted, the bankruptcy court, issued a judgment that didn't contain a number. It just said the claims. We asked to get that fixed. We had an evidentiary hearing, and we showed him what the claims were, and we established what the claims were. They included the American Bank claim. They included the B's claim. Those are all allowed claims in the Yellowstone Club Chapter 11 case. There's really not much question about that. And that's what the judge wanted to give us, was the amount of allowed claims in the case. And there's no, I mean, if you go look at the record and look at what evidence supports the complaint about those two components of the $41 million, there's just nothing there. I mean, it's pretty black and white. Finally, in the notes case, I, as I mentioned before, was a little confused about whether Judge Feist was relying on collateral estoppel or whether he was making new findings with regard to the separate fraudulent transfer and the effect of the release, because he was... There is a difference in the... He treated all the documents as one release. But it's not at all clear that Judge Kircher was actually dealing with the EDRA assumption part. He was not, Your Honour. He was not. So is your understanding that Judge Feist was dealing with that separately, made a separate finding that there was... Was he relying on the finding that she was... He did not make the finding that she was in fault and did she? It was Judge Kircher, right? Judge Kircher made that finding. Was he relying on that as a collateral estoppel? I'm sorry? Judge Feist did not reach the issue of her insolvency because he found the actual fraudulent intent based upon collateral estoppel. Thus, he didn't reach the constructive fraudulent intent portion of our motion for summary judgment where EDRA's insolvency... So he found actual fraudulent intent even though he was talking about a different document than the documents that Judge Kircher was dealing with? He's talking about what he's finding in actual fraudulent transfer is the transfer of the release that released Tim Blixeth. That's what he's finding to be. And it's the MSA release, the assumption agreement release, and the cancellation of the notes all released Tim Blixeth from liability on the notes. That release, the release of Tim Blixeth from liability, was exactly what was litigated in AP 14. But it wouldn't make any difference if there was equivalent value because she assumed the notes? It would make a difference. I mean, it wouldn't make a difference to an actual fraudulent intent. Actual fraudulent intent can happen regardless of equivalent value. There then becomes, under the Uniform Fraudulent Transfer Act, there then becomes an issue of what you can recover for the fraudulent transfer if you have a good faith transferee. But remember, in this case, IDRA is kind of like a satellite in this transaction. The transfer is from BLX, BDI, to Tim Blixeth. What it gets in return comes from IDRA. And so what IDRA gave in return, if it had been, let's just say she had been able to pay $200 million and she wasn't insolvent, but she was, there would be an issue if she was a good faith transferee. If it was still a fraudulent intent, there would be an issue of whether or not, as a good faith transferee, you could recover from that. It seems relevant to his good or bad faith, whether he thought she was going to be paying those notes. Well, the truth of the matter is, in August of 2008, when the transfers occurred and the release was given, IDRA Blixeth probably did not appreciate that she was insolvent. The real asset she got in the bankruptcy, I mean in the divorce, was the Yellow Sun Club. I'm having a hard time transferring the determination that was made by Judge Kershaw directly and with no additional findings to this context. I understand, Your Honor. Remember that the only basis of Judge Fee's ruling was collateral estoppel that the release of Tim Blixeth, nothing to do with IDRA, the release of Tim Blixeth had been decided to be an actual fraudulent transfer in AP14. That it's the release of Tim Blixeth is the only thing that Judge Fee's was focused on. I would say, and my time is getting to be close, but I would say that under the ninth record precedent cited in our brief, this Court has authority to affirm Judge Fee's judgment on any ground raised in our summary judgment plea. And Judge Fee's, once he found actual fraudulent intent based upon collateral estoppel, did not reach our second argument, which was that the release was also a constructive fraudulent transfer. And I would submit to the Court that the evidence that we, if you're finding some trouble with collateral estoppel, the evidence that we submitted to Judge Fee conclusively establishes that BGI was insolvent at the time, that what we were releasing him, obviously, of Tim Blixeth of $200 million worth of liability on notes, and then what we received in return were replacement notes from Idra Blixeth, but the record establishes that Idra Blixeth was insolvent. And lest there be any doubt about it, Mr. Blixeth's own expert submitted a report in a related adversary proceeding in Montana prior to all this, which was introduced into the summary judgment record, that Idra was insolvent at the time of that release, at the time that she gave the replacement notes, and therefore the notes were worthless, and that BGI was insolvent. So you have a transferor, BGI, which was insolvent at the time of the release of the notes, and what they get in return is worthless because what they get in return are notes from Idra Blixeth, who was insolvent. And those things were established. Judge Fee didn't reach it, I assume because he didn't feel like he needed to. But if for some reason this Court has an issue, we ask you to consider that alternative ground in the record for supporting the judgment in our favor. Thank you. Thank you. We've got a little time. Want to take a minute? No, thank you very much, Your Honor. Quickly, no value received by Idra Blixeth in the divorce, which is what I heard colleagues say. Idra Blixeth got over $400 million in unencumbered assets, and that's not even including the Yellowstone Club. I mean, at the time of the divorce, she received $207.5 million real estate, free and clear. And so when she executes notes, I mean, the Blixeths were asset-rich, cash-poor. But when she executes these notes, there's plenty of assets, including the Yellowstone Club, that she's got. I mean, and what has Mr. Blixeth got? She gets all the assets that were purchased with the loan proceeds of Credit Suisse. What does Mr. Blixeth get? He just says, you're going to go and run this stuff. This is what you want. You want the company. You're going to run it. You run it the way you want. I'm not involved. And Idra Blixeth obtained commitments from Cross Harbor to get a $100 million infusion of capital. And so when he's sitting there looking at a settlement agreement and they're getting all of these pieces lined up and she's got it arranged for financing, it's not fair to say, oh, in retrospect, now that I'm trying to get money from Mr. Blixeth, Idra Blixeth is insolvent. Specifically in the note case, I mean, it's the intent of the transferor that's at issue, not the intent of the transferee. And there's no evidence at all in any of the cases that Idra Blixeth had any kind of intent whatsoever. There's no evidence. So when Judge Feese looks at granting summary judgment, it's a classic issue of fact at the very least because there's no evidence that she has any kind of a fraudulent intent. Not Mr. Blixeth. Mr. Blixeth is the transferee. And there was no evidence introduced on that issue. And then the evidence, my colleague talked about the value of the releases. Well, there's no evidence about the value of the releases. Their own expert in AP14 said, I'm not valuing the releases. I have to factor in, you have to factor in contingent liability, how much you could possibly collect. There's a number of different contingencies that have to be analyzed before you value the release of an unliquidated claim. And there's no evidence of what that release is valued at. It just pulled out of thin air. And to say that it's worth $420 million is just not unsupported anywhere. And the fact is that if you take a look at the marital settlement agreement and the divorce proceedings, you have a tremendous amount of assets that are all split up. And when you take a look at what was received by Mrs. Blixeth and was received by Mr. Blixeth, it's hard to say that there was any kind of a fraudulent transfer between them in connection with any of those issues. So thank you very much, Your Honor. Occasions are you will stand submitted. We are adjourned.
judges: Kozinski, Paez, Berzon